1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JOSE ABEL GARCIA,                            No.  2:19-CV-9434-TLN-DMC-P

12                      Plaintiff,

13            v.                                   <u>FINDINGS AND RECOMMENDATIONS</u>

14   HLA WIN, et al.,

15                      Defendants.

16

17            Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983.  Pending before the Court is Defendants' unopposed motion for summary

19   judgment, ECF No. 63.

20

21                              **I. BACKGROUND**

22            This action proceeds on Plaintiff's first amended complaint.  <u>See</u> ECF No. 6.

23   After screening, the following are the defendants in this matter:  (1) Dr. Hla Win; (2) Dr. T.

24   Bzoskie; (3) Dr. Malet; (4) Dr. Robert Chapnick; (5) Dr. Shefanli Awatani; and (6) Dr. Robert

25   Duncan.  <u>See</u> ECF No. 17; <u>see also</u> ECF No. 24.  The Court found the below claims sufficient to

26   pass the screening stage.

27   / / /

28   / / /

                                        1

1

Claim 1—Orthotic Boots

2       Plaintiff alleges Defendants Win, Bzoskie, Malet, Chapnick, Awatani, and Duncan

3   violated his Eighth Amendment right to adequate medical care by denying him medically

4   prescribed orthotic boots Plaintiff requires to manage symptoms of his diabetes.  See ECF No. 17;

5   see also ECF No. 24.

6

Claim 2—Rosacea

7       Second, Plaintiff alleges Defendant Win violated his Eighth Amendment right to

8   adequate medical care by prescribing him a previously "failed" medication to treat his severe

9   rosacea that caused allergic reactions.  See ECF No. 17; see also ECF No. 24.  Plaintiff also

10  alleges Defendant Chapnick violated his Eighth Amendment rights to adequate medical care by

11  denying his administrative appeal on the same issue regarding his inability to get a different

12  prescription to treat his rosacea.  Defendant Chapnick denied Plaintiff's appeal, stating it was not

13  "medically indicated" for Plaintiff to switch from a primary care provider to a dermatology

14  specialist because he was already prescribed the allegedly failed medication.  See ECF No. 17;

15  see also ECF No. 24.

16

Claim 3—Eye

17      Third, Plaintiff alleges Defendant Win violated his Eighth Amendment right to

18  adequate medical care by ignoring Plaintiff's complaints after a cataract and lens implant

19  replacement surgery in his right eye.  Plaintiff allegedly complained to Defendant Win "for

20  months about loss of vision, with pain, swelling and the eye being severally [sic] blood shot."

21  ECF No. 6, pg. 21.  Plaintiff alleges when he complained to Defendant Win, he was "ignored or

22  denied any medical care or treatment."  Id.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

2

## II. DEFENDANTS' EVIDENCE

Defendants included a Statement of Undisputed Facts alongside their motion.

Plaintiff has not opposed Defendant's motion nor disputed any of Defendants' facts.

Facts Relevant to Claim 1

Defendants' undisputed facts relevant to Plaintiff's first claim are as follows:

27.  Mr. Garcia had been diabetic for many years, and had chronic foot pain when he transferred to [Deuel Vocational Institution ("DVI")].

30.  In treating patients with diabetes, it is important to monitor the feet for sores or ulcers that do not heal or may become infected.

31.  While Mr. Garcia was under Dr. Win's care, Dr. Win did not observe sores or ulcers on his feet.

32.  Throughout his time at DVI, Mr. Garcia continued to do regular exercise including walking.

33.  Mr. Garcia maintained his job, first as a janitor, and then as a painter, during his time as Dr. Win's patients.

34.  Dr. Win does not recall Mr. Garcia requesting signed medical paperwork, called a lay-in, to excuse him from work.

36.  In 2013, Dr. Win observed Mr. Garcia had pes cavus, which are high arches, and prescribed arch cushions for foot pain.

37.  The arch cushions were to be worn with Mr. Garcia's work boots for cushion.

42.  Based on his examination, Dr. Win's medical opinion was that continued use of the arch cushions were the best course of treatment for Mr. Garcia's foot pain, at the time, not a soft shoe.

50.  Dr. Malet examined Mr. Garcia noting his high arches and diagnosed heel spurs.

51.  Dr. Malet observed Mr. Garcia walked with a steady gate, was wearing shoes with inserts to accommodate painful and tender feet, and Mr. Garcia had no ulcers or sores on his feet.

52.  Based on Dr. Malet's examination of Mr. Garcia in 2015, he concurred with Dr. Win that a soft shoe chrono was not medically indicated at the time.

56.  Dr. Win diagnosed plantar fasciitis and prescribed a comprehensive accommodation chrono to allow for medically indicated limitations at Mr. Garcia's work assignment, while wearing work boots with arch cushions.

59.  Dr. Win determined the comprehensive accommodation chrono in addition to the arch supports was the best medical course of treatment at that time to address Mr. Garcia's foot pain, not orthotic boots.

60.  Dr. Malet also examine Mr. Garcia on three later occasions in 2016.

61.  Mr. Garcia again requested orthotic boots relative to his visits with Dr. Malet.

62.  Dr. Malet did not observe any ulcers.

66.  Dr. Malet's assessment was to consider extra depth shoes for diabetic feet, not orthotic boots.

67.  In Mr. Garcia's follow-up appointment with Dr. Win, Dr. Win ordered Darco Gentle Step Men's Diabetic Shoes—a shoe specifically for diabetic feet—for Mr. Garcia.

71.  Mr. Garcia did not have complaints about the Darco shoes, however in October 2017, Mr. Garcia was informed by his work supervisor that he could not wear them to work because of work safety requirements.

72.  Dr. Win opined that the Darco shoes were the best shoes for Mr. Garcia's medical condition.

74.  Dr. Win's request for orthotic boots was denied by Dr. Barber, a non-defendant, because they were not medically indicated for diabetic feet.

79.  Mr. Garcia did not want to change to a job better suited for his medical condition, so Dr. Win again requested approval for custom orthotic boots in September 2018, although the Darco shoe remained the medically indicated and best shoe to manage his diabetic symptoms.

80.  This time, Dr. Win's request was approved, and Mr. Garcia received orthopedic work boots.

81.  Dr. Awatani saw Mr. Garcia the same day he received the custom orthotic boots to confirm they fit and Mr. Garcia had no complaints.

ECF No. 63-2, pgs. 4-11.

Facts Relevant to Claim 2

Defendants' undisputed facts relevant to Plaintiff's second claim are as follows:

82.  Mr. Garcia has had chronic rosacea for many years.

83.  He had this condition prior to his incarceration in 2000.

/ / /

4

84.  Rosacea is a skin condition that causes blushing or flushing and visible blood vessels in the face.  It may also include red bumps called papules.  Acute flare-ups may include small pus filled bumps called pustules.  Overtime, rosacea can thicken the skin on the nose called rhinophyma.  There is no cure for rosacea.  Treatment is focused on controlling the acute flare-ups with medication.  There is also no medical literature to support that one topical treatment is superior to another.

85.  Dr. Win prescribed Metrogel also known as Metronidazole, a topical medication, to treat Mr. Garcia's rosacea in 2015.

86.  Metrogel is an antibiotic medication that helps swelling and reduces pustules.

87.  At the time, Mr. Garcia's nose was larger than average, but he had no erythema or skin rash.

88.  Dr. Win followed up with Mr. Garcia after prescribing the medication.

89.  Mr. Garcia did not report an allergic reaction, and requested more Metrogel.

90.  In early 2016 Mr. Garcia reported the Metrogel was not working.

91.  Dr. Win therefore prescribed a different topical antibiotic medication called Clindamycin, and referred Mr. Garcia to dermatologist Dr. Hrabko to be evaluated.

92.  Dr. Hrabko did not observe pustules and agreed that Mr. Garcia should continue with the Clindamycin, advising that it takes several months to assess the effectiveness of the treatment.

93.  He further advised that the treatment would not affect the redness very much, but what could be looked for is a reduction in papules and pustules.

94.  Dr. Win followed-up with Mr. Garcia after his visit with the dermatologist, and did not observe pustules.

95.  Dr. Win continued with Dr. Hrabko's treatment plan.

96.  In late 2016, Mr. Garcia reported the Clindamycin was not working.

97.  Dr. Win did not observe papules or pustules.

98.  Mr. Garcia was also seen by Dr. White, a colleague of Dr. Win, who did not observe any pus.

/ / /

/ / /

99.  Mr. Garcia was referred back to Dr. Hrabko to be re-evaluated. Dr. Hrabko observed papules, but no pustules and recommended continued Clindamycin for a year.  Dr. Win followed Dr. Hrabko's recommendation.

100.  In 2018, Mr. Garcia reported the Clindamycin was not working.

101.  Dr. Win evaluated Mr. Garcia on January 19, 2018, and found his rosacea to be stable.  Dr. Win did not observe any pustules that would indicate a flare-up and prescribed Metrogel for maintenance. Mr. Garcia's rosacea had been maintained on Metrogel while under Dr. Win's care in 2015.  Based on Dr. Win's examination, a dermatologist was not indicated at the time because Mr. Garcia's rosacea was stable.

102.  Mr. Garcia filed health care appeal, DVI-HC-18000402, related to the Clindamycin not working and requested to be seen by a dermatologist.

103.  Dr. Chapnick reviewed the appeal at the first level of review.

104.  Dr. Win continued to prescribe Metrogel as needed in 2019, and did not observe Mr. Garcia to have an allergic reaction.

105.  In managing Mr. Garcia's chronic rosacea, as his primary care physician, Dr. Win did not observe Mr. Garcia to have pustules that would indicate an acute flare-up.

ECF No. 63-2, pgs. 11-14.

Facts Relevant to Claim 3

Defendants' undisputed facts relevant to Plaintiff's third claim are as follows:

106.  At DVI, when Mr. Garcia had a complaint related to vision, Dr. Win referred him to the institution optometrist for evaluation and coordination of care.

107.  Mr. Garcia was seen regularly by the optometrist to evaluate his vision.

108.  Optometrist P. Nguyen diagnosed a cataract in the right eye-a clouding of the lens of the eye.

110.  Ms. Nguyen prescribed glasses and referred Mr. Garcia to ophthalmologist, Dr. Tesluk.

111.  Dr. Tesluk confirmed the diagnosis and performed cataract lens implant surgery in 2015.  Mr. Garcia's right eye improved after surgery.

112.  In 2016, Mr. Garcia developed some residual scar tissue behind his lens implant called Posterior Capsule Opacification ("PCO") that caused recurrent blurry vision in the right eye.  Ms. Nguyen made the diagnosis of PCO, and referred Mr. Garcia back to Dr. Tesluk.

6

113.  Dr. Tesulk [sic] performed YAG laser capsulotomy to treat the condition.  Mr. Garcia's right eye improved after surgery.

114.  When Mr. Garcia reported blurry vision in the right eye in 2017, Dr. Win referred him to Ms. Nguyen for evaluation.

115.  Ms. Nguyen referred Mr. Garcia to another ophthalmologist, Dr. Zeiter, for a second opinion.

116.  Dr. Zeiter's recommendation was to observe the right eye and do a cataract extraction on the left eye to improve visual function.

117.  Mr. Garcia refused the procedure.

118.  The option to have the procedure was left open to Mr. Garcia, should he change his mind.

ECF No. 63-2, pgs. 15-16.

### III. STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

/ / /

/ / /

/ / /

7

1    If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4    establish the existence of this factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material, in support of its contention that the

7    dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

8    opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

9    affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

10   242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

11   Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12   return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

13   (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

14   simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

15   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

16   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

17   claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

18   of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

19   In resolving the summary judgment motion, the court examines the pleadings,

20   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

21   See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

22   477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

23   court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

24   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

25   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

26   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

27   1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

28   judge, not whether there is literally no evidence, but whether there is any upon which a jury could

8

1  properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

2  imposed." Anderson, 477 U.S. at 251.

3

4  ## IV. DISUCSSION

5  Defendants argue that they did not act with deliberate indifference and that they

6  are entitled to qualified immunity.

7  ### A.    Medical Needs

8  The treatment a prisoner receives in prison and the conditions under which the

9  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

10  and unusual punishment.   See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

11  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

12  of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

13  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

14  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

15  "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy,

16  801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

17  two requirements are met: (1) objectively, the official's act or omission must be so serious such

18  that it results in the denial of the minimal civilized measure of life's necessities; and (2)

19  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

20  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

21  official must have a "sufficiently culpable mind."  See id.

22  Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

23  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

24  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

25  needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

26  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

27  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

28  wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

9

1    on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

2    also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

3    are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

4    whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

5    condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

6    1131-32 (9th Cir. 2000) (en banc).

7            The requirement of deliberate indifference is less stringent in medical needs cases

8    than in other Eighth Amendment contexts because the responsibility to provide inmates with

9    medical care does not generally conflict with competing penological concerns.  See McGuckin,

10   974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

11   decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

12   1989).  The complete denial of medical attention may constitute deliberate indifference.  See

13   Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

14   treatment, or interference with medical treatment, may also constitute deliberate indifference.  See

15   Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

16   that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

17           Negligence in diagnosing or treating a medical condition does not, however, give

18   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

19   difference of opinion between the prisoner and medical providers concerning the appropriate

20   course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

21   90 F.3d 330, 332 (9th Cir. 1996).

22           Claim 1—Orthotic Boots

23           The undisputed facts demonstrate that Plaintiff was examined regularly and his

24   chronic diabetic foot pain was managed.  Defendants Win and Malet never observed ulcers or

25   sores on Mr. Garcia's feet.  Defendant Malet agreed with Defendant Win's course of treatment.

26   Defendants Chapnick, Bzoskie, and Duncan found Defendant Win's treatment to be reasonable

27   and within the standard of care after conducting their own reviews.  Defendant Win was able to

28   obtain prescription approval for orthotic boots.  However, Plaintiff's work assignment would not

10

1  allow Plaintiff to wear the boots due to safety concerns.  Plaintiff expressed no interest in

2  changing to a more suitable work assignment for his medical condition.  Defendant Awatani's

3  only involvement was to confirm that the orthotic boots fit Plaintiff.  A mere difference of

4  opinion in treatment does not give rise to an Eighth Amendment claim.  In light of the undisputed

5  facts, the Undersigned recommends that Plaintiff's Eighth Amendment claims as to how

6  Defendants treated Plaintiff's feet be dismissed.

7  <u>Claim 2—Rosacea</u>

8  <u>Defendant Win</u>

9  Defendant Win saw Plaintiff regarding Plaintiff's concerns related to rosacea.

10 Defendant Win did not observe any pustules which can indicate an acute flare-up, and he

11 prescribed Metrogel, for maintenance of Plaintiff's rosacea.  After a month, Defendant Win

12 followed up with Plaintiff who had no complaints concerning the Metrogel treatment.

13 Additionally, Plaintiff requested more Metrogel to treat his Rosacea, and Plaintiff's prescription

14 was renewed.  After Plaintiff reported that the Metrogel was not effective, Defendant Win

15 promptly referred Plaintiff to a dermatologist.  Defendant Win prescribed Clindamycin pending

16 the dermatology appointment.  The dermatologist recommended that Plaintiff continue using the

17 Clindamycin medication that Defendant Win prescribed.  Defendant Win consistently followed

18 up with Plaintiff and promptly responded to Plaintiff's complaints.  Again, a mere difference of

19 opinion in treatment does not give rise to an Eighth Amendment claim.  The Undersigned

20 recommends that Plaintiff's Eighth Amendment claim against Defendant Win for the treatment of

21 Plaintiff's rosacea be dismissed.

22 <u>Defendant Chapnick</u>

23 Defendant Chapnick was not deliberately indifferent when he responded to

24 Plaintiff's health care appeals requesting to see a dermatologist and for a different prescription for

25 rosacea.  Defendant Chapnick reviewed the treatment provided and determined that it was

26 reasonable.  Defendant Chapnick considered that Plaintiff was evaluated by a dermatologist twice

27 in one year, and the recommendations of the dermatologist were implemented.  There is no

28 evidence presented that Defendant Chapnick chose or permitted to continue an unacceptable

1    course of treatment in conscious disregard of Plaintiff's health.  Therefore, the Undersigned

2    recommends that Plaintiff's Eighth Amendment claim against Defendant Chapnick for the

3    treatment of Plaintiff's rosacea be dismissed.

4              Claim 3—Eye

5              Defendant Win referred Plaintiff regularly to the institution optometrist to monitor

6    his vision, and followed the recommendations of the prison optometrist and outside

7    ophthalmologists who examined Plaintiff's right eye.  Plaintiff reported some cloudy spots in his

8    right eye to Defendant Win.  Defendant Win promptly referred Plaintiff to an optometrist.  This

9    happened again after the optometrist visit.  An ophthalmologist recommended cataract surgery on

10   the left eye.  Defendant Win got approval for the left eye surgery.  However, Plaintiff refused the

11   procedure.  To the extent that Plaintiff contends he should have been provided additional

12   corrective surgery on the right eye, that is a difference of opinion which is not a constitutional

13   violation.  The Undersigned recommends that Plaintiff's Eighth Amendment claim against

14   Defendant Win for the treatment of his eyes be dismissed.

15                      **B.      Qualified Immunity**

16             Government officials enjoy qualified immunity from civil damages unless their

17   conduct violates "clearly established statutory or constitutional rights of which a reasonable

18   person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

19   qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

20   law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

21   immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

22   injury, the facts alleged show the defendant's conduct violated a constitutional right.  See Saucier

23   v. Katz, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether

24   the right was clearly established.  See id.  This inquiry "must be undertaken in light of the specific

25   context of the case, not as a broad general proposition . . . ."  Id.  "[T]he right the official is

26   alleged to have violated must have been 'clearly established' in a more particularized, and hence

27   more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable

28   official would understand that what he is doing violates that right."  Id. at 202 (citation omitted).

1    Thus, the final step in the analysis is to determine whether a reasonable officer in similar

2    circumstances would have thought his conduct violated the alleged right.  See id. at 205.

3              When identifying the right allegedly violated, the court must define the right more

4    narrowly than the constitutional provision guaranteeing the right, but more broadly than the

5    factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th

6    Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently

7    clear that a reasonable official would understand [that] what [the official] is doing violates the

8    right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

9    concludes that a right was clearly established, an officer is not entitled to qualified immunity

10   because a reasonably competent public official is charged with knowing the law governing his

11   conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

12   has alleged a violation of a clearly established right, the government official is entitled to

13   qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

14   did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

15   also Saucier, 533 U.S. at 205.

16             The first factors in the qualified immunity analysis involve purely legal questions.

17   See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

18   determination based on a prior factual finding as to the reasonableness of the government

19   official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

20   has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,

21   555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

22   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See

23   Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

24             Qualified immunity shields government officials who, in the face of clearly

25   established law, acted reasonably but nonetheless violated some constitutional right.  Here,

26   Defendants assessed Plaintiff's conditions and appropriately treated them.  The undisputed

27   evidence shows the Defendants did not violate Plaintiff's rights.  Therefore, qualified immunity is

28   not an issue in this case.  And even if the Court concluded that Defendants did violate a clearly

1   established right, Defendants would be entitled to qualified immunity because the evidence shows

2   that Defendants acted reasonably by appropriately treating Plaintiff's medical concerns.

3

4                                    **V. CONCLUSION**

5           Based on the foregoing, the undersigned recommends that:

6           1.      Defendants' unopposed motion for summary judgment, ECF No. 63, be

7   granted; and

8           2.      Judgment be entered as a matter of law in favor of Defendants.

9           These findings and recommendations are submitted to the United States District

10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days

11  after being served with these findings and recommendations, any party may file written objections

12  with the court.  Responses to objections shall be filed within 14 days after service of objections.

13  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v.

14  Y1st, 951 F.2d 1153 (9th Cir. 1991).

15

16  Dated:  April 19, 2022

17                                              _____
                                                DENNIS M. COTA
18                                              UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28